## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

DEBORAH WAHLSTROM and
SUCCESSLINE, INC.,

      Plaintiffs,

                                 Case No. 15-14113

v.                              HON. DENISE PAGE HOOD

JASON MONK, EDWARD BURLEY,
GLENN VOORHESS, JEANINE
WALKER, and MOUNT CLEMENS
COMMUNITY SCHOOLS BOARD
OF TRUSTEES,

      Defendants.
_____/

## ORDER GRANTING IN PART AND
## DENYING IN PART DEFENDANTS' MOTION
## FOR SUMMARY JUDGMENT [#49]

## I.    INTRODUCTION

On November 23, 2015, Plaintiff Deborah Wahlstrom ("Wahlstrom") filed the

instant action for: (1) tortious interference with an advantageous business relationship

or expectancy (the "tortious interference claim"), (2) violations of Michigan's Open

Meetings Act, and (3) civil conspiracy, all stemming from her termination as

Superintendent of the Mount Clemens Community School District (the "District").

In November 2015, Wahlstrom moved for, and the Court granted, leave to amend her

Complaint to add a second Plaintiff, Successline, Inc. ("Successline"). Plaintiffs filed their Amended Complaint on December 2, 2016. On March 24, 2017, Defendants filed a Motion for Summary Judgment, Dkt. No. 49. Defendants' Motion for Summary Judgment has been fully briefed and the Court has scheduled a hearing for October 31, 2017. For the reasons that follow, Defendants' Motion for Summary Judgment is granted in part and denied in part .

## II.      STATEMENT OF FACTS

Wahlstrom is the co-owner of Successline, a Virginia corporation that provides educational consultation services. For the time period relevant to this action, Successline's only functions were to provide: (1) the services of Wahlstrom as the Superintendent of the District, and (2) a means for Wahlstrom to receive payment from the District.

Successline and the District entered a Professional Services Agreement (the "Agreement") on August 1, 2014. The Agreement was the third 12-month contract the parties had executed, as the parties had renewed both an initial contract (from August 1, 2012 to July 31, 2013) and a second contract (from August 1, 2013 to July 31, 2014) providing for Wahlstrom's services as Superintendent of the District. The Agreement provided, in part, follows:

1.      <u>Employment</u> - Successline Inc. shall provide the services of Deborah Wahlstrom, PhD, (hereinafter "Superintendent") to

perform the normal and customary duties and responsibilities of Superintendent of Schools as well as the Curriculum Leader for the School District. It is expressly understood that the Superintendent is an employee of Successline, Inc.

* * * * *

3. <u>Duties and Responsibilities</u> - The Superintendent further agrees to devote her talents, skills, efforts and abilities toward competently and proficiently fulfilling all duties assigned by the Board of Education. Further, the Superintendent agrees to comply with and fulfill all responsibilities and tasks required by state and federal law and regulations and by the Board of Education to carry out the educational programs and policies of the School District during the entire term of the Contract. Further, the Superintendent pledges to use her best efforts to maintain and improve the quality of the operation of the School District and constantly promote efficiency in all areas of her responsibility.

* * * * *

6. <u>Length of Contract/Extension</u> - This contract shall commence on August 1, 2014, upon agreement by the Board of Education of the School District and Successline, Inc. and terminate on July 31, 2015. The contract may be extended for additional periods of time as agreed upon by the parties. In the event the contract is not renewed[,] the Board of Education will provide a ninety (90) calendar day notice. Further, if the decision by the Board of Education, in its sole discretion, is made not to renew the contract and the contract will expire in less than ninety (90) days, the contract will automatically be extended by the number of days equal to ninety (90) days prior to expiration.

* * * * *

Dkt. No. 38, Ex. B, ¶¶ 1, 3, 6, at PgID 494-95. As Superintendent, Wahlstrom also

was "expected to attend meetings of the Board of Education and its committees and

3

to attend and participate in School District functions or, on occasion, other civic activities having relation to the School District," without receiving any additional compensation. Dkt. No. 38, Ex. B, ¶ 7, at PgID 496.

On or about April 13, 2015, Wahlstrom received an anonymous letter jointly addressed to her, the District's Board of Trustees (the "Board"), the "Mount Clemens High School Administration," and Mitch Hotts ("Hotts"), a reporter for the Macomb Daily newspaper. This letter sought to "expose some unethical and illegal practices that are taking place at Mount Clemens High School," which allegedly included Defendant Jason Monk's management of the Mount Clemens Athletic Booster Club ("Booster Club"), his selling of food from his own restaurant at sporting events under the guise of raising money for the Booster Club, his lack of a permit or license from the City of Mount Clemens or its Health Department to sell such food, and various other allegations of conflicts of interest and nepotism related to Defendant Monk's coaching of the high school girls' volleyball and basketball teams (collectively, the "Anonymous Allegations").

A sealed copy of the Anonymous Allegations was placed on each Board member's chair prior to the start of the April 15, 2015 Board meeting. Defendant Glenn Voorhess, upset about the envelope, ripped it up and complained about it during the Board comments portion of the meeting. Defendant Monk indicated how

upset he was to Defendant Voorhess when they left the meeting. None of the Defendants (or other Board members) looked into the Anonymous Allegations. On May 12, 2015, Wahlstrom met with Defendant Board members Bruley, Monk, and Voorhess and discussed, among other things, the Board goals on which Wahlstrom was to be evaluated. At the May 20, 2015 Board meeting, Defendant Monk thanked a number of people, including Wahlstrom. The Anonymous Allegations were not mentioned.

Wahlstrom's husband, Mark Wahlstrom, testified that the Board's attorney, Robert Nyovich, at the direction of Board President Earl Rickman contacted Mr. Wahlstrom approximately a month prior to the Board's June 30, 2015 evaluation of Wahlstrom. The purpose of the call was to discuss the renewal of the Agreement. Dkt. No. 61-4, PgID 1391.

On June 16, 2015, Wahlstrom participated in a conference call with Renee Clemens and Teresa Davis (the District's two Assistant Superintendents), and Defendant Monk. The call pertained to the Anonymous Allegations, and Wahlstrom questioned Defendant Monk about various aspects of the Anonymous Allegations. During this conversation, Defendant Monk indicated that he felt that "it was a personal attack because [he] was a public figure." Dkt. No. 61-6, PgID 1484 (Page 121:19-21). The same day (June 16, 2015), Wahlstrom, Clemens, and Davis

contacted the Macomb County Sheriff's Department ("Sheriff's Department") and the State of Michigan Attorney General's Office ("Attorney General") about the Anonymous Allegations for the first time. They reported to the Sheriff's Department a complaint of embezzlement. A deputy came to the high school to take a statement, which was forwarded to Detective Sergeant Stacy O'Brien to investigate. Clemens subsequently spoke on the phone to Detective O'Brien about the investigation on at least two occasions.

At a Board meeting on June 17, 2015, Defendant Monk stated, in part:

Final note: I was elected not to be a rubber stamp. To assure this district gets it right. Being uncomfortable is good. I will support what is right. I will challenge what needs fixing. Outside of attacks on myself, I will maintain professionalism.

Dkt. No. 61-18, PgID 1719. On June 18, 2015, Wahlstrom and Rickman sent a letter to Defendant Monk, advising him that they had begun the investigations with the Sheriff's Department and the Attorney General, as well as advising him that the Board had not authorized him to fundraise on behalf of the District and to cease any such efforts, including the use of the District's name, logo, symbols or likenesses in fundraising. In response, Defendant Monk denied any wrongdoing and stated:

Let me conclude by stating that the approach taken with this inquiry is troubling, as it is an apparent personal attack. I have always been readily accessible and would have been willing and able to allay any concerns without need for the threatening undertone of your correspondence which, to me, borders on defamation. It questions my integrity and

generates unwarranted "water cooler" discussions about a respected member of the School Board and a longstanding supporter of Mount Clemens Schools.

Dkt. No. 61-20, PgID 1725-26.

On June 28, 2015, Hotts contacted Wahlstrom with questions related to the Anonymous Allegations and the June 2015 Board meeting. On June 29, 2015, Defendant Monk, in conjunction with a letter of reprimand related to a period when he was the head coach of the high school girls basketball team, sent to Rickman an email that stated, in part: "Since I am dealing with the conflict between me and the superintendent, . . ." Dkt. No. 61-21, PgID 1728.

On June 30, 2015, Wahlstrom and Clemens drafted a press release to address Hotts' inquiries and circulated it to all Board members approximately seven hours before the Board met and evaluated Wahlstrom's performance as Superintendent. The press release included statements that: (a) the District had "received several recent inquiries about the MCB Parent Group, an organization purportedly raising funds on the District's behalf"; and (b) "the District directed MCB Parent Group to immediately cease all fundraising efforts that suggest or imply the District's or Board's approval and further directed MCB Parent Group to immediately cease using the District's name, logo, and symbols." Dkt. No. 61-23, PgID 1734.

On June 30, 2015, the Board held a special meeting for the purpose of

discussing Wahlstrom's performance as Superintendent. Dkt. No. 61-26, PgID 1750-52. Wahlstrom was not invited to the meeting or any part of it, and the Board moved into closed session for about two hours to evaluate Wahlstrom's performance. Wahlstrom was not advised what transpired in that part of the special meeting. The members of the Board reviewed Wahlstrom's performance and she received, in Plaintiffs' words, an "overwhelmingly" positive review. Dkt. No. 61-29, PgID 1763 ("She had a 2.8 out of 4 in her evaluation," Rickman said.). As of June 30, 2015, Defendant Jeanine Walker thought Wahlstrom was doing a good job, and Defendant Walker's rating of Wahlstrom at that time was 3.1 out of 4.

After the June 30, 2015 Board meeting, Nyovich contacted Mr. Wahlstrom to say that Nyovich "was authorized by Earl Rickham to contact [Mr. Wahlstrom] to let [Mr. Wahlstrom] know that the contract was not going to be renewed. And it was not a performance issue. And that four board members had made the decision that they were [going to] vote no for the contract and he couldn't tell me why." *Id.* at PgID 1409. Rickman testified that he did not believe Wahlstrom's performance was the reason that the Agreement was not renewed. Dkt. No. 61-10, PgID 1639. Rickman also testified that the Board had discussed whether Wahlstrom or Clemens had sent the Anonymous Allegations. *Id.* at PgID 1622-23.

When Wahlstrom inquired about the evaluation on July 2, 2015, Board

President Rickman replied that the Board had reviewed her evaluation on June 30, 2015. He indicated that the decision regarding the evaluation must be made in public and that Board members had voiced their opposition to renewing the Superintendent's contract. Defendant Voorhess admits that he declared that he was voting to not renew the contract, and Board member David McFadden stated that the Board called the Board's attorney during the meeting to discuss the procedural method by which to terminate Wahlstrom's employment. Dkt. No. 61-8, PgID 1576; Dkt. No. 61-11, PgID 1652.

On July 5, 2015, an investigative article written by Hotts was published in the Macomb Daily. It was titled "Questions arise over Mount Clemens booster club headed by school board trustee." Dkt. No. 61-37, PgID 1842-44. The article published the text of the June 30, 2015 press release drafted by Wahlstrom and Clemens and quoted Wahlstrom as follows: "There are a number of citizens and people working with the booster club who have expressed some serious concerns about the club and we are legally obligated to look into these matters." *Id.* When Hotts asked Defendant Monk about the Anonymous Allegations, Defendant Monk responded "talk to my attorney." *Id.* Board President Rickman and Defendant Bruley testified that Defendant Monk was very upset when the July 5, 2015 article was published. Dkt. No. 61-10, PgID 1618; Dkt. No. 61-7, PgID 1557.

At a special meeting of the Board on July 6, 2015 to vote on whether to renew the Agreement, the Defendant Board members voted against the renewal of the Agreement (resulting in a 4-3 vote against renewal). No reasons for any Board member's vote were given at the time. After the meeting, Rickman said, "She had a 2.8 out of 4 in her evaluation . . . [s]o she wasn't let go based on her accomplishing goals or anything like that. It must have been something other than those elements." Dkt. No. 61-29, PgID 1763. As a result of that vote, Wahlstrom's employment with the District concluded in October 2015.

The Sheriff's Department investigation of Defendant Monk for embezzlement resulted in the Detective O'Brien "claiming that there was insufficient evidence presented to [him] at the time of [his] investigation to charge [Defendant Monk] with that charge," Dkt. No. 61-12, PgID 1674, which Plaintiff suggests was because there were not finances or manpower to complete the investigation. Dkt. No. 61, PgID 1201. The Attorney General's office was only given Defendant Monk's own accounting records, including a profit and loss statement and a Transaction Detail by Account. Detective O'Brien testified that he did not know if those were "a correct statement of the finances of the organization." Dkt. NO. 61-12, PgID 1671. No bank records from the Booster Club's bank were requested. *Id.* Detective O'Brien testified that Wahlstrom (and Clemens) had "reasonable suspicions" to think there was

embezzlement and ask the Sheriff's Department to investigate. *Id.* at PgID 1679.

In an undated response to a July 22, 2015 letter from the Attorney General's office, Defendant Monk reiterated that he thought that "the Superintendent and the [anonymous] citizen previously mentioned, have conspired to defame me, my wife and my company." Dkt. No. 60-22, PgID 2374-76. Defendant Monk admitted that all of Wahlstrom's "defamatory" and "conspiratorial" conduct occurred prior to the Board's vote regarding the renewal of Wahlstrom's employment. *Id.* at 2375.

## III. APPLICABLE LAW

Rule 56(a) of the Rules of Civil Procedures provides that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The presence of factual disputes will preclude granting of summary judgment only if the disputes are genuine and concern material facts. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Although the Court must view the motion in the light most favorable to the nonmoving party, where "the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co.*

*v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Summary judgment must be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. *Celotex Corp.*, 477 U.S. at 322-23. A court must look to the substantive law to identify which facts are material. *Anderson*, 477 U.S. at 248.

## IV.    ANALYSIS

### A.    Count I - Tortious Interference Claim

Defendants previously filed a motion for partial summary judgment on this claim, wherein they argued that Wahlstrom's tortious interference claim fails as a matter of law because she never had a contractual relationship with the District and could not establish any reasonable likelihood or probability of a continued business relationship or expectancy of such a relationship after July 31, 2015. The Court denied Defendants' motion for partial summary judgment and Defendants' subsequent motion for reconsideration. *See* Dkt. Nos. 58 and 66.

The elements of a tortious interference claim are:

(1)     the existence of a valid business relationship or expectancy that is not necessarily predicated on an enforceable contract,

(2)     knowledge of the relationship or expectancy on the part of the defendant interferer,

(3)     an intentional interference by the defendant inducing or causing a breach or termination of the relationship or expectancy, and

(4)     resulting damage to the party whose relationship or expectancy was disrupted.

*See, e.g., Health Call of Detroit v. Atrium Home & Health Care Servs., Inc.*, 268 Mich.App. 83, 89-90 (2005); *Badiee v. Brighton Area Schs.*, 265 Mich.App. 343, 365-66 (2005).  "The [business relationship or expectancy of a relationship] must be a reasonable likelihood or a probability, not mere wishful thinking." *Trepel v. Pontiac Osteo. Hosp.*, 135 Mich.App. 361, 368 (1984).  To demonstrate such a realistic expectation, the plaintiff must prove an anticipated business relationship with an identifiable class of third parties. *Schipani v. Ford Motor Co.*, 102 Mich.App. 606, 613 (1981).  "One who alleges tortious interference with contractual or business relationship must allege the intentional doing of a per se wrongful act or the doing of a lawful act with malice and unjustified in law for the purpose of invading the contractual rights or business relationship of another." *Feldman v. Green*, 138 Mich.App. 360, 378 (1984).  "Where the defendant's actions were motivated by legitimate business reasons, its actions would not constitute improper motive **of**

interference." *Mino v. Clio Sch. Dist.*, 255 Mich.App. 60, 78 (2003) (citation and internal quotations omitted).  If plaintiff relies on a lawful act, he must demonstrate specific affirmative acts that corroborate the unlawful purpose of the interference. *Feldman*, 138 Mich.App. at 367-70.

Defendant argues that a tortious interference claim cannot be sustained against the members of the Board because they are not third parties to the business relationship at issue. Citing *Feaheny v. Caldwell*, 175 Mich.App. 291, 305, overruled on other grounds *Knight Enterprises v. RPF Oil Co.*, 299 Mich.App. 271 (2013).  A plaintiff must demonstrate that the defendant employees or officers were acting pursuant to their own motives and interests, as opposed to the service of the employer. *Id.*  As the Michigan Court of Appeals concluded, "it is not the task of the courts or jury to evaluate the business judgment of a corporation's top executives." *Feaheny*, 175 Mich.App. at 306.  The party with whom the plaintiff has a business relationship "cannot properly be considered a third party to the relationship, and therefore cannot be guilty of interfering with it." *Chambers v. City of Detroit*, 786 F.Supp.2d 1253, 1275 (E.D. Mich. 2011).

Defendants also assert that neither Plaintiff can demonstrate that the Board or the identified Board members stood as third parties to the contractual relationship between Successline and the District.  Defendants assert that the business expectancy

at issue in this case was the Agreement, which was between Successline and the District (through the Board), with the Board retaining sole discretion whether to renew the Agreement. Citing Dkt. No. 49-2, PgID 679. Defendants state that it is impossible for Plaintiffs to show that the Board and its members stood as "third parties" to the Agreement or any business expectancy. Citing *Chambers*, 786 F.Supp.2d at 1276. Defendants claim Plaintiffs are asking the Court to look beyond the clear, unambiguous: (a) language of the Agreement; (b) testimony of Defendants; and (c) status of the law because Wahlstrom believes her role in investigating allegations against Monk motivated the decisionmaking of the Board members.

With respect to Successline, the Court finds that Defendants are correct. Successline and the Board (the District) are parties to the Agreement – and would be parties to any renewal of the Agreement. As the Board is a party to the Agreement and would be a party to any renewal of the Agreement, the Board cannot tortiously interfere with it. As the individual Defendants are members of the Board – and must necessarily act in order for the Board to act – they also cannot be considered third-parties to the Agreement. Accordingly, Defendants' motion for summary judgment on the tortious interference claim against Successline is granted.

Wahlstrom is not a party to the Agreement – and as Defendant have repeatedly announced – any contract with the Board (the District), any action by the Board or the

Board members *vis a vis* Wahlstrom (such as any contract Wahlstrom had with Successline) would be as a third party or as third parties. Defendants argue that Wahlstrom cannot establish that she had a contractual relationship or business expectancy with the District or the Board or that either Plaintiff could establish any expected relationship beyond July 31, 2015. For the same reasons the Court rejected that argument in Docket Nos. 58 and 66, Defendants' argument fails. The Court denies Defendants' motion for summary judgment on Plaintiffs' tortious interference claim as it relates to Wahlstrom.

## B.    Open Meetings Act Claim

"Under the [Open Meetings Act], public bodies must conduct their meetings, make all of their decisions, and conduct their deliberations (when a quorum is present) at meetings open to the public." *Speicher v. Columbia Bd. of Trustees*, 497 Mich. 125, 134-35 (2014) (citing M.C.L. § 15.263). In this case, it is undisputed that Defendants met in closed session to conduct Wahlstrom's evaluation on June 30, 2015, and: (1) at least one Board member (Voorhess) stated that he was voting "no" on renewing the Agreement; (2) the Board's attorney was called to discuss the proper procedural method by which to terminate the Agreement; and (3) it was clear to Rickman that there were not enough votes to renew the Agreement, as evidenced by his communication to Wahlstrom following the June 30, 2015 closed session meeting.

M.C.L. § 15.268 identifies a number of specific conditions under which a public body may meet in closed session, but Defendants do not suggest that they satisfied any of the conditions set forth in Section 15.268 with respect to the June 30, 2015 Board meeting. Between June 30 and July 5, 2015, Nyovich (as an agent of the Board/Rickman, such that Nyovich's comments would constitute party (Board) admissions) contacted Wahlstrom's home to let her know the Agreement would not be renewed, as four Board members had made the decision that they were going to vote no. Although Nyovich could not say why the Board had decided to vote no, he said it was not a performance issue. As the described events constitute evidence that the Board met in closed session, the Court finds there is a genuine dispute of material fact whether the Board complied with the Open Meetings Act when the Board evaluated Wahlstrom and deliberated regarding the Agreement in closed session on June 30, 2015.

Section 15.271(1) provides that "[i]f a public body is not complying with [the Open Meetings Act], . . . a person may commence a civil action to compel compliance or to enjoin further noncompliance with this act." Section 15.273 provides:

(1) A public official who intentionally violates this act shall be personally liable in a civil action for actual and exemplary damages of not more than $500.00 total, plus court costs and actual attorney fees to a person or group of persons bringing the action.

(2) Not more than 1 action under this section shall be brought against a

17

public official for a single meeting. An action under this section shall be commenced within 180 days after the date of the violation which gives rise to the cause of action.

(3) An action for damages under this section may be joined with an action for injunctive or exemplary relief under section 11.

Section 15.271(4) provides that "[i]f a public body is not complying with this act, and a person commences a civil action against the public body for injunctive relief to compel compliance or to enjoin further noncompliance with the act and succeeds in obtaining relief in the action, the person shall recover court cots and actual attorney fees for the action."

Defendants, without any evidence or support, propose that "*if* this Court were to find that the Board improperly evaluated Wahlstrom, who was **not** an employee of the District, in a closed session, [the Court] nevertheless should find that the Board is actively complying with this Act, and that Plaintiff cannot establish continued noncompliance required to issue affirmative injunctive relief. M.C.L. 15.271(4)." Dkt. No. 49, PgID 669. As Plaintiffs state, the statute cited by Defendants (Section 15.271(4)) pertains only to Plaintiffs' ability to "recover court costs and actual attorney fees for the action" and does not address whether there was a violation or whether any individual Defendants are liable under Section 15.273.

Plaintiffs argue that, not only do Defendants fail to provide support for any claims of "active compliance," Defendants fail to show that "continued

18

noncompliance" is needed to issue affirmative injunctive relief. Plaintiffs argue that Defendants continued to violate the Open Meetings Act, citing testimony of Rickman that the Board did not maintain minutes or notice the meeting as required by Open Meetings Act. Dkt. No. 61-10, PgID 1632. Plaintiffs also do not specify how or if the individual Defendants intentionally violated the Open Meetings Act (as Section 15.273 specifies "public official"), though it is clear that the Board voted to meet in closed session during the course of the June 30, 2015 meeting.

Based on the parties' arguments, the Court cannot conclude that Defendants did not violate the Open Meetings Act and denies Defendants' motion for summary judgment with respect to Plaintiffs' Open Meetings Act claim.

## C. Civil Conspiracy

Under Michigan law, civil conspiracy is defined as a "combination of two or more persons, by some concerted action, to accomplish a criminal or unlawful purpose, or to accomplish a lawful purpose by criminal or unlawful means." *Admiral Ins. Co. v. Columbia Cas. Ins. Co.*, 194 Mich.App. 300, 313 (1992); *Fenestra, Inc. v. Gulf Am. Land Corp.*, 377 Mich. 565, 587 (1966). "A common design or purpose is the essence of the charge of conspiracy . . ." *Brown v. Evans*, 149 Mich. 429, 431-32 (1907); *El Camino Res., LTD v. Huntington Nat. Bank*, 722 F.Supp.2d 875, 900 (W.D. Mich. 2010), aff'd, 712 F.3d 917 (6th Cir. 2013) (liability for civil conspiracy is

dependent upon defendants' adoption of the common purpose or design by express or implied agreement). The gravamen of the action is not the combination but the wrongful act(s) causing damage. *Coronet Dev. Co. v. F.S.W., Inc.*, 379 Mich. 302, 309-10 (1967); *El Camino*, 722 F.Supp. at 900 (liability is premised upon not agreement, but action in furtherance of a common purpose). As summarized by the *El Camino* court:

> . . . Michigan law holds defendants liable for all foreseeable acts of the other tortfeasor. "Conspiracy, by reason of the connection involved among the conspirators, may cause individuals to be responsible, who, but for the conspiracy, would not be responsible at all." *Roche*, 9 N.W.2d at 863 (quoting Bush, 16 N.W. at 225). Likewise, if two persons act in concert with a common design or purpose and one of them commits a wrongful act injuring a third party, the person acting in concert with the wrongdoer is liable for the injury under a concert of action theory. *Gaufin v. Valind*, 268 Mich. 269, 256 N.W. 335, 336 (1934). In either case, the defendant's embrace of the actor's purpose or design—whether by agreement or by action—renders the defendant liable for the underlying tort.

*El Camino*, 722 F. Supp. 2d at 900–01.

Wahlstrom contends there is a genuine issue of material fact whether Defendant Monk had malicious intent in voting against the renewal of the Agreement. The Court agrees with that assertion. Defendant Monk's comments, the fact that Defendant Monk was under investigation at the time, and the fact that the Macomb Daily had published an article on July 5, 2015 (the day before the meeting), about which Defendant Monk was not happy, Dkt. No. 61-10, PgID 1618; 61-8, PgID 1557, are

sufficient to enable a reasonable jury to find malicious intent behind Defendant Monk's vote.

As to the other Defendants, Plaintiffs state that it is undisputed that the Board voted against renewal of the Agreement a 4-3 vote, such that if any of the four individual defendants had voted "yes," the Agreement (and Wahlstrom's employment as Superintendent) would have been renewed. Plaintiffs argue that each "no" vote "aided and ratified the malicious act of Defendant Monk." Plaintiffs suggest that "[e]ven if . . . Voorhess, Bruley, and Walker did not have any retaliatory animus against Wahlstrom, because they acted in "common design or purpose" with Defendant Monk, they are liable for the injury to Plaintiffs under a concert of action theory. Citing *El Camino*, 722 F.Supp.2d at 901.

Defendants do not challenge Plaintiffs' argument with respect to Defendant Monk, but Defendants contend that Plaintiffs have failed to establish a genuine dispute of material fact that any other Defendant conspired or acted in concert with Defendant Monk. The Court agrees with Defendants *vis a vis* Defendant Bruley but not Defendants Walker and Voorhess.

Defendants have submitted evidence that Defendant Bruley voted against renewing the Agreement in 2014 and numerous instances from 2014 and 2015 where Defendant Bruley was dissatisfied with Wahlstrom's performance and responses at

Board meetings. Plaintiffs have not offered any evidence that would demonstrate Defendant Bruley did anything in concert with, or agreed to vote with, Defendants Monk, Voorhess and/or Walker. There is no evidence of a conspiracy or common plan among Defendants Monk, Voorhess, and/or Walker and Defendant Bruley to commit a tortious act. *Rosenberg v. Rosenberg Bros. Special Account*, 351 N.W.2d 563, 575 (Mich.App. 1984). Plaintiffs simply offer the fact that Defendant Bruley, like Defendants Monk, Voorhess, and Walker, voted against renewing the Agreement. Finally, Wahlstrom admitted that she has no evidence that Defendant Bruley voted not to renew the Agreement because of anything related to Defendant Monk. Dkt. No. 49-3, PgID 730. The Court dismisses the conspiracy claim as to Defendant Bruley.

Although Wahlstrom testified that she had no evidence that Defendant Walker voted not to renew the Agreement because of anything related to Defendant Monk, Dkt. No. 49-3, PgID 733, there is evidence which creates a genuine dispute of material fact whether Defendant Walker conspired with Defendant Monk and/or Defendant Voorhess. Until the July 6, 2015 Board vote to renew the Agreement, Defendant Walker's actions were inconsistent with a vote to not renew the Agreement. Specifically, Defendant Walker had voted in favor of renewing the Agreement in 2014, had given Wahlstrom a rating of 3.1 (out of 4) in her review of Wahlstrom in 2015, and thought Wahlstrom was doing a good job as of June 30, 2015. Dkt. No. 61-

9, PgID 1597. The Court denies Defendants' request to dismiss the conspiracy claim against Defendant Walker.

With respect to Defendant Voorhess, he undisputedly is friends with Defendant Monk. Defendant Voorhess was upset about the Anonymous Allegations, so much so that he ripped them up at the April 2015 Board meeting. Defendant Voorhess acknowledged that Defendant Monk told Defendant Voorhess how upset he was about the Anonymous Allegations "[o]n the way out to the parking lot" after the April Board meeting. Dkt. No. 61-8. It is not clear whether Voorhess had voted for or against renewal of the Agreement in 2013 and 2014. The Court denies Defendants' request to dismiss the conspiracy claim against Defendant Voorhess.

## V.    CONCLUSION

Accordingly,

IT IS ORDERED that Defendants' Motion for Summary Judgment [Dkt. No. 49] is **GRANTED IN PART** and **DENIED IN PART**.

IT IS FURTHER ORDERED that:

A.    Count I is dismissed as to Successline but may proceed as to Wahlstrom;

B.    Count II continues with respect to all parties; and

C.     Count III is dismissed with respect to Defendant Bruley and continues with

respect to Defendants Monk, Voorhess, and Walker.

IT IS ORDERED.

S/Denise Page Hood
Denise Page Hood
Chief Judge, United States District Court

Dated:  March 30, 2018

I hereby certify that a copy of the foregoing document was served upon counsel of
record on March 30, 2018, by electronic and/or ordinary mail.

S/LaShawn R. Saulsberry
Case Manager